Opinion issued June 18, 2009
















 
 




In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-08-00588-CV
____________

KEVIN RITTGER, M.D., Appellant

V.

VIRGINIA LOU DANOS, INDIVIDUALLY AND AS NEXT FRIEND OF
RYAN COCHRAN, A MINOR, Appellees




On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2005-34257



 
O P I N I O N
In this interlocutory appeal, appellant, Kevin Rittger, M.D., challenges the trial
court’s order denying his motion to dismiss the medical malpractice claims made
against him by appellee, Lou Virginia Danos, individually and as next friend of Ryan
Cochran, a minor. In his sole issue, Rittger contends that the trial court erred by not
dismissing the suit on the ground that Danos submitted expert reports that did not
satisfy the requirements of Chapter 74 of the Texas Civil Practice and Remedies
Code. We affirm.I. Background
          On May 30, 2003, Danos, who was 28-weeks pregnant with her second child,
went to St. John Hospital’s emergency room complaining of right arm numbness. 
Rittger, the emergency room physician, obtained a CT scan of her head and called for
a consultation by Danos’s obstetrician, Dr. Victor Patel. Dr. Patel evaluated Danos
and ordered a neurological examination. Before the scheduled neurological exam
could take place, Patel discharged Danos with a diagnosis of “generalized anxiety.” 
Two days later, Danos went to Memorial Hermann Hospital with weakness of her
right upper and lower extremities. Medical Professionals there found that she had
experienced a left middle cerebral artery (“MCA”) stroke due to a clot at the
bifurcation of the left MCA. 
          Danos sued Rittger and other healthcare providers for medical negligence.


 
Pursuant to section 74.351 of the Texas Civil Practice and Remedies Code,


 Danos
timely filed expert reports from Dave David, M.D., an obstetrician, and Frank Baker,
M.D., an emergency room physician. Dr. David’s report did not address the care
provided by Rittger. Rittger objected to the sufficiency of Baker’s report and moved
to dismiss. The trial court ruled that the report did not comply with section 74.351
and gave Danos 30 days to cure the deficiency.


 Within the 30 days, Danos served
a new report from Baker as well as a report from John Meyer, M.D., a neurological
expert not previously designated. The trial court found that Baker, although qualified
to opine on the standard of care and its breach, failed to show the nexus between the
negligence and the injury. The trial court further found that, section 74.351(c) did 
not permit Danos to serve a report from a new expert. The trial court dismissed
Danos’s case and awarded Rittger $10,000 in attorney’s fees.
          Danos appealed the dismissal of her case to this court, and a panel of this court
affirmed the judgment of the trial court. Danos v. Rittger, 253 S.W.3d 294, 295 (Tex.
App.—Houston [1st Dist.] 2007, pet. granted). The Supreme Court reversed,
holding that section 74.351(a) allows a claimant to cure a deficiency in a report by
serving a report from a separate expert during the 30-day cure period. Danos v.
Rittger, 253 S.W.3d 215 (Tex. 2008). The Supreme Court remanded the case to the
trial court to consider the adequacy of Dr. Meyer’s expert report. Id. at 215–16. 
Following an oral hearing, the trial court denied Rittger’s motion to dismiss, and this
interlocutory appeal followed. 
          On appeal, Rittger reasserts his challenges to the adequacy of the plaintiff’s
expert reports, claiming that the reports of Baker and Meyer, considered together or
separately, fail to satisfy Chapter 74's requirements. Rittger also seeks remand on
the issue of attorney’s fees. 
II. Medical Expert Reports
A.      Standard of Review
          We review all section 74.351 rulings under an abuse of discretion standard. 
Am. Transitional Care Centers v. Palacios, 46 S.W.3d 873, 877 (Tex. 2001). A trial
court abuses its discretion if it acts in an arbitrary or unreasonable manner without
reference to guiding rules or principles. See Garcia v. Martinez, 988 S.W.2d 219,
222 (Tex. 1999). When reviewing matters committed to the trial court’s discretion,
we may not substitute our own judgment for that of the trial court. Walker v. Packer,
827 S.W.2d 833, 839 (Tex. 1992). A trial court does not abuse its discretion merely
because it decides a discretionary matter differently than an appellate court would in
a similar circumstance. See Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,
242 (Tex. 1985).
          Although we may defer to the trial court’s factual determinations, we review
questions of law de novo. Rittmer v. Garza, 65 S.W.3d 718, 722 (Tex.
App.—Houston [14th Dist.] 2001, no pet.). To the extent resolution of the issue
before the trial court requires interpretation of the statute itself, we apply a de novo
standard. Buck v. Blum, 130 S.W.3d 285, 290 (Tex. App.—Houston [14th Dist.]
2004, no pet.).
          In reviewing whether an expert report complies with Chapter 74.351, we
evaluate whether the report “represents a good-faith effort” to comply with the
statute. Strom v. Mem’l Hermann Hosp. Sys., 110 S.W.3d 216, 221 (Tex.
App.—Houston [1st Dist.] 2003, pet. denied). In making this evaluation, we must
look only at the information that is contained within the four corners of the report. 
Bowie Mem’l Hosp. v. Wright, 79 S.W.3d 48, 53 (Tex. 2002).
 
 
B.      Chapter 74 Expert Report Requirements
          Pursuant to section 74.351, medical-malpractice plaintiffs must provide each
defendant physician and health care provider with an expert report or voluntarily
nonsuit the action. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (Vernon Supp.
2008). If a claimant timely furnishes an expert report, a defendant may file a motion
challenging the report’s adequacy. Id. The trial court shall grant the motion only if
it appears, after hearing, that the report does not represent a good faith effort to
comply with the statutory definition of an expert report. See id. § 74.351(1). The
statute defines an expert report as a written report by an expert that provides, as to
each defendant, a fair summary of the expert’s opinions as of the date of the report
regarding: (1) applicable standards of care; (2) the manner in which the care provided
failed to meet the standards; and (3) the causal relationship between that failure and
the injury, harm, or damages claimed. See id. § 74.351(r)(6); Palacios, 46 S.W.3d at
877.
          Although the report need not marshall all the plaintiff’s proof, it must include
the expert’s opinions on the three statutory elements—standard of care, breach, and
causation. See Palacios, 46 S.W.3d at 878; Gray v. CHCA Bayshore, L.P., 189
S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In detailing these
elements, the report must provide enough information to fulfill two purposes if it is
to constitute a good faith effort. First, the report must inform the defendant of the
specific conduct the plaintiff has called into question. Palacios, 46 S.W.3d at 879. 
Second, the report must provide a basis for the trial court to conclude that the claims
have merit. Id. A report that merely states the expert’s conclusions as to the standard
of care, breach, and causation does not fulfill these two purposes. Id. The expert
must explain the basis for his statements and link his conclusions to the facts. Bowie,
79 S.W.3d at 52 (citing Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999)). 
Furthermore, in assessing the report’s sufficiency, the trial court may not draw any
inferences, and instead must rely exclusively on the information contained within the
report’s four corners. See Palacios, 46 S.W.3d at 878.
C.      Adequacy of Experts’ Reports
          Reading both the Baker and Meyer reports together, we conclude that the
documents satisfy all three elements under Palacios. Specifically, they identify the
standard of care, describe the conduct that allegedly breached that standard, and
identified a causal relationship between the alleged breach and Danos’s injury.
          1.       Dr. Baker’s Reports
          First, we review the adequacy of Dr. Baker’s reports as it pertains to the
standard of care for Rittger and the breach of that standard. The initial report by
Baker collectively addressed the negligence of Rittger and others. Specifically, the
report alleged that:
Dr. Rittger and Dr. V. Patel deviated from the standard of care by failing
to diagnose TIA [transient ischemic attack] and by failing to admit the
patient for further evaluation and treatment of her TIA. That evaluation
should have initially consisted of laboratory work such as a CBC with
platelet count, prothrombin time, and partial thromboplastin time in an
effort to explore hypercoagulabile states, an echocardiogram looking for
cardiac sources of emboli, and a carotid Dopplar ultrasound to evaluate
the patient for carotid sources of emboli, and, if warranted, an
MIR/MRA for further evaluation. It is well-known that pregnancy
predisposes patients to thrombo-embolic phenomenon including TIA’s
and strokes. This is because physiologic states associated with elevated
estrogen and progesterone levels such as pregnancy and the use of birth
control pills cause hypercoagulabile states that are associated with
increased clotting resulting in strokes [sic] and other thrombo-embolic
phenomenon. Failure to make the diagnosis of TIA and to formulate a
plan to treat Virginia Danos was a deviation from the standard of care
and causally related to her subsequent stroke.

          . . .
 
With a reasonable degree of medical certainty, had she been admitted
and treated, her TIA would not have progressed to a left MCA stroke.

          In the second report, Baker added the following paragraph:
Virginia Danos was pregnant at the time of this incident and, because of
her pregnancy, she had elevated estrogen and progesterone levels. As
a direct result, she was predisposed to thrombo-embolic events including
TIA’s and strokes. Dr. Rittger and Dr. V. Patel should have recognized
that she was predisposed to these thrombo-embolic events because of
her elevated estrogen and progesterone levels. High suspicions should
have led them to diagnose TIA which should have resulted in admission
for further evaluation and treatment.

          Dr. Baker’s reports detail the standard of care to which Rittger was required to
conform and the breach of that standard. See Tex. Civ. Prac. & Rem. Code Ann.
§ 74.351(r)(6). The reports provide Rittger with a fair summary of Baker’s opinions
concerning the standard of care and how Rittger failed to meet that standard of care. 
Palacios, 46 S.W.3d at 880. Nevertheless, Rittger argues that the reports are
insufficient because Baker collectively referenced Rittger and Patel in discussing the
standard of care. We disagree.
          Appellees are not required to specifically state the same standard of care for
each individual physician practicing on the same patient when each physician owes
the same duties to the patient. In re Boone, 223 S.W.3d 398, 405–06 (Tex.
App.—Amarillo 2006, no pet.) (holding expert report sufficient with same standard
of care for multiple defendants when each defendant was performing same duties on
same patient); Romero v. Lieberman, 232 S.W.3d 385, 391–92 (Tex. App.—Dallas
2007, no pet.) (defendants’ argument that expert report was insufficient because they
were not given individual standards of care and were being held to “one size fits all”
standard were unmeritorious as each physician owed same duties and were held to
same standard).
          Rittger relies on Taylor v. Christus Spohn Health System Corp. and Rittmer
v. Garza to support his contention that Baker’s reports are inadequate as to the
standard of care and breach because it collectively refers to a group of doctors rather
than setting forth individual standards as to Rittiger. See Taylor v. Christus Spohn
Health Sys. Corp., 169 S.W.3d 241, 243 (Tex. App.—Corpus Christ 2005, no pet);
Rittmer v. Garza, 65 S.W.3d 718, 721 (Tex. App.—Houston [14th Dist. 2001, no
pet.). We find both Taylor and Rittmer distinguishable.
          In Taylor, the defendants included a hospital, a doctors’ association, an
emergency room physician, and a cardiologist, and the expert failed to state what each
defendant should have done to meet the standard of care and failed to do, and how the
failure led to the patients death. Taylor, 169 S.W.3d at 243. Here, Baker’s report
comments on the failure of a uniform duty owed by both doctors to the same patient. 
And, also unlike Taylor, Baker specifically names the individual doctors, identifies
their specific negligent actions, and discusses their failures according to the uniform
standard of care that both doctors owed to Danos.
          In Rittmer, the plaintiff conceded her report failed to set out specific standards
of care for two distinct specialists—an oncologist performing a mastectomy and a
plastic surgeon performing reconstructive surgery. Rittmer, 65 S.W.3d at 722. This
is distinct from Baker’s articulation of a standard of care for a duty owed to a patient
in an emergency room setting.
          Rittger argues further that Baker’s report failed to specify what particular
actions or what additional specific care Rittger should have provided Danos. On the
contrary, Baker’s supplemental report indicates that, upon recognizing the high risk
of TIA and stroke present during pregnancy, Rittger and Patel should have admitted
Danos for further evaluation and treatment. 
          For the foregoing reasons, we conclude that Baker’s report provides a
sufficiently specific standard of care and specifically identifies the breach of that
standard of care for an emergency room physician. Thus, Baker’s reports meet the
first and second prongs of Palacios.
          2.       Dr. Meyer’s Report
          Next, we review Dr. Meyer’s report to determine whether it sufficiently links
the alleged breaches of the standard of care with Danos’s injuries. Meyer’s report
reads, in pertinent part:
Dr. Rittger and Dr. Patel and the triage staff at Christus St. John
Hospital all fell below [the] standard of care for not admitting [Danos]
and working her up for probable stroke with diagnosis of left middle
cerebral artery impending thrombosis or stroke due to toxemia of
pregnancy.
 
. . .
 
Christus St. John Hospital and the conduct of ER Triage nurse, C.
Southard, RN, Kevin Rittger, MD, John Gillespie, MD and Victor Patel,
MD were all negligent and all fell below the standard of care in their
treatment of Lou Virginia Danos by not admitting her to the hospital
with diagnosis of impending stroke and treating her with anti-platelet
drugs, control of her BP and treatment of her eclampsia or toxemia of
pregnancy and arranging for immediate Caesarian Section by delivering
her child for prevention of complications or pre-eclampsia or toxemia
pregnancy.
 
As a result, Ms. Virginia Danos suffered from thrombosis of her left
middle cerebral artery as a complication of toxemia of pregnancy, which
if treated early, [the] stroke would have been prevented and she would
have remained neurologically normal. Apart from termination of
pregnancy by Caesarian section, control of her elevated blood pressure,
plus treatment with anti-platelet drugs would have all been indicated to
prevent her stroke.
 
 
          We conclude that Meyer’s report is sufficient to establish causation because it
links Rittger’s alleged breaches of the standard of care with Danos’s injuries. Meyer
unequivocally states that Danos suffered neurological injury as the result of
appellant’s breach of the standard of care. Meyer reaches this conclusion after he
sets forth the pertinent standard of care and how Danos’s injury could have been
prevented. 
          Nevertheless, Rittger contends that Meyer’s report is conclusory as to
causation. We disagree. Meyer causally links Rittger’s failure to admit and treat
Danos for her pregnancy-related toxemia directly to Danos’s thrombosis of her left
middle cerebral artery and thus provides a sufficient basis for his opinion. 
Consequently, we conclude that Meyer’s report satisfies the third prong of Palacios. 
D.      Qualifications of Experts
          Section 74.351 defines an “expert” with respect to a person opining as to
whether a physician departed from accepted standards of medical care, as one who
is qualified to testify under the requirements of Section 74.401. See Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(r)(5)(A) (Vernon Supp. 2008). Section 74.401 states
that a physician is qualified to give such testimony against a physician if he: (1) is
practicing medicine at the time such testimony is given or was practicing medicine
at the time the claim arose; (2) has knowledge of accepted standards of medical care
for the diagnosis, care, or treatment of the illness, injury, or condition involved in the
claim; and (3) is qualified on the basis of training or experience to offer an expert
opinion regarding those accepted standards of medical care. Tex. Civ. Prac. Rem.
Code Ann. § 74.401(a) (Vernon 2005).
          When determining whether a witness is qualified on the basis of training or
experience, the court considers whether, “at the time the claim arose or at the time
the testimony is given, the witness (1) is board certified or has other substantial
training or experience in an area of medical practice relevant to the claim and (2) is
actively practicing medicine in rendering medical care services relevant to the claim.” 
Id. § 74.401(c) (Vernon 2005).
          The expert testifying in a medical malpractice case need not be a specialist in
the particular branch of the profession for which testimony is offered; the statute
setting out the requisite qualifications focuses not on the defendant doctor’s area of
expertise, but on the condition involved in the claim. Blan v. Ali, 7 S.W.3d 741, 745
(Tex. App.—Houston [14th Dist.] 1999, no pet.). 
          1.       Dr. Baker
          Baker is board certified in emergency medicine. As such, he has the training
and experience to testify concerning the appropriate standard of care for an
emergency room physician. Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(3)
(Vernon 2005). Rittger does not dispute that Baker is qualified to testify regarding
the standard of care and breach. Danos, 253 S.W.3d at 299.
          2.       Dr. Meyer
          Rittger argues that neither Meyer’s report nor his curriculum vitae qualify
Meyer, a neurologist, to provide an opinion on the pertinent standard of care or
breach thereof by Rittger as an emergency room physician. Danos, as the expert’s
proponent, has the burden to show that Meyer is qualified and that Meyer’s report
satisfies the statutory requirements. Mem’l Hermann Healthcare Sys. v. Burrell, 230
S.W.3d 755, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.). No definitive
guidelines exist for determining whether a witness’s education, experience, skill, or
training qualify him as an expert. Id. at 762.
           As a board-certified neurologist and professor in Baylor College of Medicine’s
Department of Neurology, Meyer has knowledge of the accepted standards of care
for brain trauma. Where a particular subject of inquiry is common to and equally
developed in all fields of practice, and the prospective medical expert witness has
practical knowledge of what is usually and customarily done by a practitioner under
circumstances similar to those which confronted the practitioner charged with
malpractice, the witness is qualified to testify. Simpson v. Glenn, 537 S.W.2d 114,
117 (Tex. App.—Amarillo 1976, writ ref’d n.r.e.). The treatment of patients with
brain trauma is common in the field of neurology; therefore Dr. Meyer qualifies as
an expert. The fact that Danos was pregnant when she experienced her stroke or that
she presented herself in an emergency room setting does not require that Dr. Meyer
be an obstetrician or emergency room physician. Dr. Meyer is shown to be
sufficiently competent and qualified to testify as to the care of patients with stroke as
a complication of pregnancy-related toxemia. See Simpson, 537 S.W.2d at 116–18
(concluding that general physician qualified to testify as expert against physician
specializing in obstetrics and gynecology).III. Conclusion
          The expert reports, considered together, satisfy the requirements provided in
Palacios by informing the appellant of the specific conduct called into question and
giving the trial court a basis to conclude whether or not the claims have merit. See
Palacios, 46 S.W.3d at 879. The reports comply with section 74.351 by detailing the
standard of care to which Rittiger was required to conform, the breach of that
standard, and causation. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6);
Palacios, 46 S.W.3d at 878. Based on the standards articulated in Palacios, we
conclude that Danos made a good faith effort to comply with the statute and that the
trial court did not err in overruling Rittiger’s objections to the expert reports. 
Accordingly, we hold that the trial court did not abuse its discretion in denying
Rittiger’s motion to dismiss. We overrule Rittiger’s issue on appeal and affirm the
order that denied Rittiger’s motion to dismiss. 










                                                             George C. Hanks, Jr.
                                                             Justice


Panel consists of Justices Keyes, Hanks, and Bland.

Publish. See Tex. R. App. P. 47.2 (b).